# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-01355-COA

IN THE MATTER OF THE ESTATE OF LARRY F. GIBSON, DECEASED: NAOMI BRADY VANDERFORD, MOTHER, CONSERVATRIX AND NEXT FRIEND OF M.B.V., A MINOR

APPELLANT

v.

THE ESTATE OF LARRY F. GIBSON, DECEASED, AND JANET GIBSON, ADMINISTRATRIX OF THE ESTATE OF LARRY F. GIBSON, DECEASED

APPELLEES

| | |
|---|---|
| DATE OF JUDGMENT: | 10/08/2024 |
| TRIAL JUDGE: | HON. GERALD MARION MARTIN |
| COURT FROM WHICH APPEALED: | SMITH COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | W. TERRELL STUBBS |
| | JOHN LANGSTON SCARBOROUGH |
| ATTORNEYS FOR APPELLEES: | JOHN RAYMOND TULLOS |
| | RAYMOND PATRICK TULLOS |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 07/21/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., LAWRENCE AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     A man passed away after a collision with a logging truck. His wife opened an estate and sought to bring a wrongful death lawsuit on behalf of herself and the couple's daughters. During this process, a woman filed a petition claiming the man was the biological father of her son. The boy's mother sought to adjudicate his paternity and have him declared as an heir-at-law.

¶2.     However, the chancery court found the paternity action untimely. Finding no error,

we affirm.

## FACTS AND PROCEDURAL HISTORY

¶3.     Dr. Larry Gibson passed away after his car struck a logging truck in February 2019. He was just shy of his 71st birthday. At the time of his death, he was married to Janet Gibson. The couple had been married for 48 years and had 2 daughters.

¶4.     Dr. Gibson died without a will. Janet filed a petition to administer his estate in March. She described that Dr. Gibson's only assets were personal assets consisting of a boat and a trailer with a value of $1,000, and a possible lawsuit against the logging company for personal injuries and wrongful death.

¶5.     The chancery court subsequently named Janet as Administratrix of Dr. Gibson's estate and issued Letters of Administration to her on April 5.  She then petitioned the chancery court for permission to file a lawsuit on behalf of Dr. Gibson's heirs-at-law and wrongful death beneficiaries. The court granted her petition.

¶6.     On April 15, Janet filed an Affidavit as Administratrix, testifying that she had "made reasonably diligent efforts to identify persons having claims against the Estate," and stated "to my knowledge, there are no such persons having any claims against the Estate of Larry F. Gibson."

¶7.     Following statutory requirements, Janet then had a Notice to Creditors published in the local newspaper, the *Smith County Reformer*. The announcement read,

> In the matter of the Estate of Larry F. Gibson . . . Letters of Administration having been granted on the 5th day of April 2019, . . . notice is hereby given to all persons having claims against said estate to present the same to the Clerk . . . for probate and registration according to law within ninety days from

2

the date of the first publication of this notice or they will be forever barred. The publication ran for four consecutive weeks on April 17, April 24, May 1, and May 8, 2019. She also sent letters to two hospitals advising them of Dr. Gibson's death in order to resolve any potential outstanding balances.

¶8.    Shortly after, Janet filed a request to sell the boat and trailer owned by Dr. Gibson, which the chancery court approved.

\* \* \*

¶9.    The docket of the estate then sat idle for a few months. That is, until 6 months later when a surprise filing appeared.

¶10.    On December 19, 2019, Naomi Vanderford filed a petition on behalf of her minor son M.V.[1] for determination of heirs and wrongful death beneficiaries. M.V. had been born in 2013 and was 6 years old at the time of filing. In the petition, she claimed M.V. was the "biological son" of Dr. Gibson.

¶11.    Naomi "request[ed] that the [c]ourt adjudicate [M.V.] to be an heir at law of Decedent." She further requested "[s]eparate from and in addition to adjudication of his right to inherit as an heir of the Decedent," "that the [c]ourt enter an order recognizing and declaring [M.V.]'s wrongful death beneficiary status."

¶12.    The petition alleged that under statute "§ 91-1-15(3)(c), adjudication of [M.V.] as a lawful heir of Decedent is proper because this action was filed within one year of [Dr. Gibson]'s death[.]" She further posited Gibson "maintained a consistent parent-child

---

[1]  Initials are used to protect the privacy of the minor child.

relationship with Petitioner[.]" According to Naomi, Janet did not specifically notify her or the child, so she "believe[d] Janet knowingly and purposefully refused to comply with statutory notice requirements in attempt to deprive [M.V.] of his rights of due process and of inheritance by and through his natural father."

¶13. Simultaneously with the administration of Dr. Gibson's estate, Naomi was divorcing her husband Scott Vanderford. Naomi had become pregnant with M.V. during their marriage. In her divorce filings, she took the legal position that Scott was the father of M.V., as he had signed the birth certificate. However, a DNA test taken during the course of the divorce proceedings showed Scott was not actually the child's biological father. Before the divorce was finalized, and before any paternity establishment or disestablishment adjudications, Scott died.

¶14. After Naomi's petition was filed, an affidavit was submitted by Naomi's attorney, Mr. Buchanan. His affidavit reads:

> That on June 13, 2019, I attended a . . . Hearing on behalf of Naomi Vanderford in Smith County . . . and outside of the Judge's Chambers, I engaged in a conversation with [Mr.] Tullos stating to him that my client's child was the child of Larry F. Gibson. At that time, I asked him if he was the attorney for the Estate of Larry F. Gibson, and he said he was. I asked him to speak to Mrs. Gibson as to whether we should make this public or was there a better way to handle it with the least embarrassment and harm to the Gibson family. Mr. Tullos informed me that Mrs. Gibson was his next-door neighbor and he would think about the situation. On another date . . . we once again discussed the situation and he informed me that I needed to file suit.[2]

---

2 The affidavit is dated February 9, 2021. The affidavit concludes: "To my knowledge, my client never received any actual notice concerning the Estate other than the general notice published in the newspaper and by the Summons and Petition for Determination of Heirs served upon her on or about December 7, 2020."

4

¶15.    Janet responded less than a month after Naomi's filing and denied any knowledge of M.V. or that there were any other heirs.

¶16.    Naomi's petition on behalf of M.V. sat cold for nearly an entire year. The estate proceedings remained stagnant until Janet filed two petitions for the determination of Dr. Gibson's heirs and his wrongful death beneficiaries. She then filed a motion to dismiss in early 2021. She argued M.V.'s "claim was untimely filed" because M.V. "failed to make a claim within 90 days after the first publication of notice to creditors." The motion pointed out that they "did not file a claim for 258 days after."

¶17.    That same month, Janet sought and received the chancery court's approval of the settlement from the collision which caused Dr. Gibson's death. The logging company agreed to resolve the personal injury and wrongful death claims for around $980,000. The money was placed into the registry of the chancery court in June, pending resolution of M.V.'s inheritance claims.

¶18.    Over 8 months later, the chancery court granted a motion allowing "partial widow's allowance" to Janet, totaling about $100,000. The court withheld distribution of the rest pending resolution of the outstanding petition and motions.

¶19.    Nearly 9 months after that, in late-2022, Naomi obtained new counsel. And after another 6 months passed by, Naomi filed a motion requesting to exhume Dr. Gibson's body for DNA testing.

¶20.    The chancery court conducted a hearing in November 2023 on Janet's motions for determination of heirs-at-law and for wrongful death beneficiaries, and Naomi's petition to

adjudicate the paternity of M.V. was brought on for hearing, along with her motion for exhumation.

¶21.   During the hearing, Janet testified that she did not know of any heirs her husband had besides their two daughters. She likewise testified she had never heard that Naomi had a relationship with her husband.

¶22.   Naomi took the stand and testified that she had worked as a nurse at the same medical facility with Dr. Gibson. They had worked together for two years, during which time she claimed to have had a relationship with him.

¶23.   She testified Dr. Gibson came to check on M.V. after he was born "[n]umerous times."  She also testified Janet knew about M.V.

¶24.   On cross, Naomi admitted she was married when M.V. was born.  Crucially, she repeatedly admitted she learned of Dr. Gibson's passing by around "the very next day."

¶25.   When asked "[d]id you tell [your lawyer] that you claim that your son [M.V.] was Dr. Gibson's child," she said yes. She claimed to have told her lawyer that Dr. Gibson was M.V.'s "father and, you know, and he's the one that told me, well, you do understand, you know, that you should have legal advice."

¶26.   By the time of trial, M.V. was 10 years old. He was called as a witness by his mother in support of her claim. In contrast to her statement that Dr. Gibson came by "numerous" times, M.V. only remembered "[f]our or five times."  He did not remember Gibson ever saying more than "a few words" to him. Then, on cross, he was asked:

> Q. [M.V.], do you remember Scott Vanderford?
> A. I do.

6

Q. What did you call him?
A. Daddy.
Q. Nothing further.

¶27. Naomi's mother was also called as a witness. She testified that Dr. Gibson had come "by to check on [M.V] one day," as "he heard he was sick and he came by[.]" She did not know of any other occasion when [M.V.] had seen him.

¶28. Lastly, the affidavit from Naomi's counsel for the divorce was entered into the record. As set out above, he testified via affidavit that his "client never received any actual notice concerning the Estate other than the general notice published in the newspaper and by the Summons and Petition for Determination of Heirs **served upon her** on or about December 7, 2020." (Emphasis added).

¶29. Consequently, the chancery court made several rulings from the bench, including finding:

> Had Mr. Buchanan, at the time he made [his] comment to Mr. Tullos, filed his petition to determine paternity or even if he had done so for a number of days thereafter, he would have still been within that 90-day window but he did not.[3]

---

[3] The chancellor further held:

> All of that testimony does appear to be in conflict. And more than that, nobody has testified that there was knowledge in the community, knowledge to sufficient people that would in any way give Ms. Janet Gibson a reason to send a notice to Naomi Vanderford, Naomi Shows now, to file an action because her child might be an illegitimate child of Dr. Gibson.

And, "There's just been no testimony that there was anything to give Ms. Gibson, as administrator, any notice about the potential paternity of [M.V.] prior to her running her Notice to Creditors."

In regards to *King*,[4] "Because this is not a case where there's obvious intent to defraud from an administrator where you had adult children that everybody knew were children[.]"

The court declared "the sole and only wrongful death beneficiaries of Larry F. Gibson, deceased, are his widow, Janet M. Gibson, Jennifer G. Greenhill and Julie G. Ainsworth." It also denied Naomi's motion to exhume Dr. Gibson for DNA testing.

¶30. Naomi appeals on behalf of M.V., challenging the statute of limitations imposed by the chancery court, as well as the determination of Dr. Gibson's beneficiaries.[5]

**STANDARD OF REVIEW**

¶31. "Application of a statute of limitation is a question of law to which a de novo standard also applies." *Knight v. Knight*, 85 So. 3d 832, 835 (¶16) (Miss. 2012) (quoting *Sarris v. Smith*, 782 So. 2d 721, 723 (¶6) (Miss. 2001)). "We approach this question with a clean slate, for our standard of review is de novo in passing on questions of law." *Id*. (quoting *Watts v. Pennington*, 598 So. 2d 1308, 1311 (Miss. 1992)).

¶32. Conversely, this Court applies a limited standard of review to findings of fact made by the chancery court. *Prout v. Williams*, 55 So. 3d 195, 197 (¶8) (Miss. Ct. App. 2011). It

---

[4] *See Smith ex rel. Young v. Est. of King*, 501 So. 2d 1120 (Miss. 1987).

[5] The parties launched procedural attacks on each other during the course of this appeal. Both were attempts to essentially gain a default ruling. Naomi argued the appellee's brief should be stricken due to a failure to cross-appeal a component of the ruling below, which was denied via prior order. The estate filed a motion styled a "Motion to Dismiss Appeal for Lack of Prosecution," which argued that because Naomi did not assign error to the payment of certain attorney's fees, that segment of her appeal should be dismissed. We deny this motion as moot, as the Court has addressed those issues raised by Naomi in her briefing. *See generally* MRAP 28 (determining that within the appellant's brief "[a] statement [of issues] shall identify the issues presented for review," and that "[n]o separate assignment of errors shall be filed").

is well established that an appellate court "will not disturb the factual findings of a chancellor unless such findings are manifestly wrong or clearly erroneous." *Est. of Dykes v. Est. of Williams*, 864 So. 2d 926, 930 (¶9) (Miss. 2003). "If there is substantial evidence to support the chancellor's findings of fact, those findings must be affirmed." *Id*. Questions of law are reviewed de novo. *Id*.

## ISSUES ON APPEAL

¶33. On appeal, Naomi raises two separate issues but they both pose the same question—whether the chancery court erred by finding that the petition filed on behalf of M.V. was untimely.

¶34. Naomi claims "the chancery court erred in its application of the ninety (90) day time limit to file a claim[.]" She argues "the administratrix was under a duty to provide actual notice to [M.V.] once she became aware of his existence and she failed to do so, thus tolling the statutory limit of ninety (90) days to file."

¶35. According to Naomi, "the ninety (90) day limitation ended on or about July 16, 2019. Sometime in June of 2019, the administratrix, through her attorney, became aware of the existence of [M.V.] and in January of 2020, [M.V.]'s petition to adjudicate paternity was filed." And further, that "the administratrix became aware of [M.V.] prior to the running of the ninety (90) period which required her to provide actual notice to him."

¶36. After review, we find that no matter how Naomi frames the issues, the inheritance claims she asserted on behalf of M.V. are procedurally barred. We further find the untimely pursuit of M.V.'s adjudication of paternity to be determinative.

**ANALYSIS**

¶37. It is uncontested that Naomi and Gibson were not married when M.V. was born or at any point after. There is no dispute that no adjudication of paternity or legitimacy of M.V. as being Dr. Gibson's biological child occurred before his death. As such, it is uncontested that M.V. is an alleged nonmarital child of Dr. Gibson.

¶38. State law governs the inheritance claims at issue here. Pursuant to section 91-1-15(3), nonmarital children:

> shall inherit from and through the illegitimate's natural father and his kindred, . . . according to the statutes of descent and distribution *if*: . . . [t]here has been an adjudication of paternity after the death of the intestate . . . in an heirship proceeding under Sections 91-1-27 and 91-1-29.[6]

Miss. Code Ann. § 91-1-15(3)(c) (Rev. 2021) (emphasis added).

---

[6] While the text of the statute still uses the antiquated term "illegitimate," for the purposes of this opinion, we opt to refer to children born to unwed parents using the phrase "nonmarital child" in place of the statutory term "illegitimate child." As eloquently expressed by Judge Westbrooks on several previous occasions,

> The laws regarding inheritance for nonmarital natural children are outdated, especially in terms of how we describe these children. For many years children who were born out of wedlock have been referred to as "illegitimate." . . . This derogatory term has plagued our society for years, often carrying caste-like undertones that lead to the unequal treatment of children who are not responsible for the circumstances of their birth. . . . [T]he stigma surrounding single parents or non-married parents does not hold the same negative effects and connotations as it once did. As society evolves, so should our statutory language that governs the classification of children born into our society and the standards used to adjudicate paternity.

*In re Est. of Lewis*, 422 So. 3d 484, 495-96 (¶¶38-40) (Miss. Ct. App. 2025) (Westbrooks, J., specially concurring); *see also Est. of Dorsey v. Matory*, No. 2024-CA-00925-COA, 2025 WL 3524732, at *8 (¶34) (Miss. Ct. App. Dec. 9, 2025) (Westbrooks, J., specially concurring).

¶39.    But the statute strictly limits when claims can be brought:

> [N]o such claim of inheritance shall be recognized *unless* the action seeking an adjudication of paternity is filed within one (1) year after the death of the intestate *or* within ninety (90) days after the first publication of notice to creditors to present their claims, *whichever is less* . . . .

Miss. Code Ann. § 91-1-15(3)(c) (Rev. 2008) (emphasis added).

¶40.    For the 90-day time limit to attach, there must be "actual, written notice . . . given to all potential illegitimate heirs who could be located with reasonable diligence." Miss. Code Ann. § 91-1-15(3)(c) (Rev. 2008) (emphasis added).

## I.       The petitioner's claims are time-barred.

¶41.    "Under Mississippi law, failure to bring a timely paternity claim bars the nonmarital child's right to inherit as an heir under our statute." *Est. of Elmore v. Williams*, 150 So. 3d 700, 702 (¶6) (Miss. 2014).

¶42.    Referring to section 91-1-15, "[t]he pertinent part of this statute gives [nonmarital] children the right to inherit from a father who died intestate, *so long as paternity has been proven*." *Est. of Thomas v. Thomas*, 883 So. 2d 1173, 1177 (¶11) (Miss. 2004) (emphasis added). "The sole limitation placed on the [nonmarital] children seeking inheritance is that their paternity claims must be filed either within one year of the death of the intestate or within 90 days of the first publication of notice." *Id*.

¶43.    Stated differently, "there is a requirement that proper and timely steps be taken by the [nonmarital child] as a *condition precedent* to inheriting from or sharing in a wrongful death action of the natural father." *Leflore ex rel. Primer v. Coleman*, 521 So. 2d 863, 868 (Miss. 1988) (emphasis added) (citing Miss. Code Ann. § 11-7-13 (Supp. 1985); § 91-1-15(3)(c)

11

(Supp. 1985)). And in Mississippi, "the law will not permit a totally unknown person to assert a claim without strictly adhering to this time requirement of asserting his claim in court, and in the manner as required by statute." *Id*.

¶44. We find that the evidence presented shows, and Naomi even concedes, that M.V.'s inheritance claims were not filed within 90-days of the first publication of notice. Therefore, his claims that hinge on an adjudication of paternity are untimely and barred.[7]

## II. Petitioner had actual notice and there was no fraud by the estate.

¶45. Nonetheless, while acknowledging the time bar, Naomi insists that the 90-day procedural bar does not apply here. In her view, a series of Supreme Court cases required Janet to provide her with actual notice, which she alleges Janet failed to provide her.

¶46. Naomi's argument on appeal relies primarily on a case that was appealed twice. After the passing of her husband, Darlene King opened and then closed his estate in due course. Darlene represented there to be no other heirs. *Smith ex rel. Young v. Est. of King*, 501 So. 2d 1120 (Miss. 1987) (*King I*). As a result, the chancery court "adjudicat[ed] the widow to be the only heir at law." *Id*. at 1121.

¶47. Afterward, a nonmarital daughter attempted to file a claim as an heir of Mr. King's estate. *Id*. at 1121. The chancery court found the claim untimely because it "was filed more than ninety days after the first publication of notice to creditors[.]" *Id*. at 1122. The child

---

[7] On appeal, Naomi concedes that her petition was not filed within the 90-day time limit from the first publication of notice. As such, to prevent the 90-day statutory bar from being raised against M.V.'s claims, there must be evidence that Janet had knowledge that M.V. was a nonmarital child of Dr. Gibson and that Janet failed to notify M.V. of the 90-day limitations period.

argued her claim should not be barred on account of fraud by the widow. *Id*. She alleged fraud in that the widow knew her husband had a relationship with another woman and knew there was possibly a nonmarital child. *Id*. The chancery court refused to allow the untimely petition. *Id*.

¶48. On appeal, the Supreme Court reversed and held that fraud could suspend the 90-day deadline. *Id*. "[A]n administratrix is under an affirmative duty to disclose to this Court the existence of known potential heirs and claimants." *Id*. at 1123. Accordingly, the Court reasoned the 90-day deadline might not apply when there was "the alleged fraudulent omission of a known heir by the administrator of an estate," or when "an executor of a will intentionally failed to disclose to the court the existence of a predetermined heir known to him." *Id*. at 1123. Under these limited circumstances, the Court "remanded for trial on the amended petition" alleging fraud by the widow. *Id*.

¶49. "Following the mandate of *Estate of King I*," the chancellor "determined that the evidence failed to show that a fraud had been perpetrated on the court." *Smith By & Through Young v. Est. of King*, 579 So. 2d 1250 (Miss. 1991) (*King II*). But on appeal the second time, our Supreme Court could not abide this ruling, explaining "[t]he difficulty we have with the chancellor's decision that no fraud was perpetrated on the court is that in this case Mrs. King claimed to be the sole heir at law and benefitted from her silence regarding the existence of Michelle Smith." *Id*. at 1252.

¶50. The widow "testified that her husband, the decedent, told her that he had sexual relations with . . . Michelle Smith's mother, one time and that [she] told him that the child,

13

Michelle Smith, was his." *Id*. at 1252. He also sent the child's mother money, although "it was not on a regular basis or for child support." *Id*. The Court emphasized that there was no "dispute that both Mrs. King, the administratrix, and her attorney were aware that Michelle Leigh Smith could be an illegitimate child of the deceased, and that they omitted bringing this fact to the attention of the court during the probate proceedings because they did not believe Michelle Smith was an heir." *Id*. at 1251-52.

¶51.    By concealing her knowledge of the child as a possible heir, the administratrix had failed in her duties. The Court held this was fraud and again required reversal. *Id*.

¶52.    However, both decisions in *King I & II* turned on a fact not present in today's case: fraud. Given the extreme situation that the widow knew her husband had a relationship, knew there was a child, knew he was told the child was his (although he disputed it), and knew he had sent money for the child, the Court had "no difficulty reaching the conclusion that the trial court erred in determining that the administratrix and her attorney did not perpetrate a fraud on the court." *Id* at 1253. It was impossible to disentangle the administratrix's intentional acts of concealment from the decree closing the estate, and so it was reversed. *Id*.[8]

¶53.    This case does not feature those facts. In contrast to the *King* administratrix who sped through the opening and closing of the estate while knowing there was a possible nonmarital heir, there was no proof of fraud by Janet here.

_____

    [8] The Court "recognize[d] that to deny an illegitimate the right to institute heirship proceedings **when the child,** of whose existence the administratrix was aware*,* ***had no knowledge that the administratrix published notice to creditors*** is a harsh result which we do not look upon favorably." *Id*. at 1253. (Emphasis added).

¶54. Instead, prior to Naomi's filing, Janet did not have any knowledge that M.V. was allegedly a child of Dr. Gibson. Indeed, there is no evidence showing that Naomi even held M.V. out as being the biological child of her and Dr. Gibson until midway through Naomi's divorce proceedings. That was the point when Naomi's divorce attorney told the attorney for the estate that Naomi claimed Dr. Gibson was the biological father of her son. Testimony before the chancery court by the widow in this case was that she was married to her husband for 48 years. Over this time, she knew of only their 2 daughters as heirs.

¶55. This stands in sharp contrast to the widow in *King I & II*. We cannot find that Janet had any reason to know of this alleged paternity claim before she published the notice to creditors for Dr. Gibson's estate.

¶56. Furthermore, the affidavit of her attorney establishes Naomi *had in fact received notice* of the estate being open. Indeed, Naomi testified she knew of Dr. Gibson's death as early as the day after he passed.

¶57. Notice to creditors was first published on April 17, 2019. The 90-day limitations period ended on July 16. Her attorney's conversation with the estate's attorney was on June 13. This was over a month before the 90-day period was over. Based on the evidence presented, we cannot find any reason that the 90-day time bar should be precluded from being raised in this case.

¶58. In sum, the proof in this case belies Naomi's argument that she did not have notice. She admitted on the stand she had notice. She also alleged that there was a "consistent parent-child relationship" with Dr. Gibson. This allegation cannot be squared with her

15

absolute inaction for a series of months.

## CONCLUSION

¶59.    Naomi's claims that her petition on behalf of M.V. should be deemed timely are

without merit.

¶60.    **AFFIRMED.**

**CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.  BARNES, C.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**